UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSHAMA GOKHALE,<br><br>Plaintiff,<br><br>v.<br><br>DOLBY LABORATORIES, INC., et al.,<br><br>Defendants. | Case No. 17-cv-03845-JST<br><br>**ORDER REGARDING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: ECF No. 91 |

Before the Court is a motion for summary judgment brought by Defendants Dolby Laboratories, Inc. ("Dolby"), Jeffrey Fehervari, and Conroy Shum. ECF No. 91. The Court will grant the motion.

I.  **BACKGROUND**[1]

Plaintiff Sushama Gokhale began working for Dolby in 2006 as an IT contractor to oversee the building of Dolby's compliance applications, systems, and data warehouses. ECF No. 99-4 (Gokhale Decl.) ¶ 2. In 2009, Dolby hired her as a full-time employee, as a Director of Global Compliance Operations. *Id.* ¶ 3. In that role, she was responsible for developing and overseeing internal applications and systems within Dolby for monitoring compliance with its licensing activities and building operational infrastructure and processes, as well as systems for managing the costs of Dolby's compliance activities. *Id.* ¶ 4.

Defendant Jeffrey Fehervari is and at relevant times was Dolby's Vice President of IP Protection. ECF No. 1 (Compl.) ¶ 7. Defendant Conroy Shum is and at relevant times was Dolby's Senior Director of Global Licensing Compliance. Gokhale Decl. ¶ 7.

---

[1] The following facts are either undisputed or taken from Plaintiff's evidence and deemed established for purposes of this summary judgment motion.

According to Gokhale, Dolby has a "fraternal culture" in which women "are systematically subjected to disparate treatment based on their gender." Compl. ¶ 13. She claims this disparate treatment manifests itself in qualified female employees being disadvantaged in hiring, promotion, and other opportunities for advancement. *Id.* ¶ 14. Gokhale was not promoted once in eleven years "despite her well-documented history of stellar performance." *Id.* ¶ 15. This history includes internal Dolby awards received in March 2008, June 2008, and March 2009 for "outstanding work that brings honor to Dolby" and "doing the right thing and doing things right." Gokhale Decl. ¶ 2.

Gokhale received annual performance reviews. Dolby's performance review form includes an "overall performance rating" category with five possible notations: 1 – "does not meet expectations"; 2 – "partially meets expectations"; 3 – "meets expectations"; 4 – "exceeds expectations"; and 5 – "outstanding." *See, e.g.*, *id.* at 28. From 2009 to 2013, Gokhale's overall performance reviews ranged from 3 to 4 points on this 5-point scale. *Id.* ¶¶ 5 ("3" in FY 2009), 6 ("4" in FY 2010/2011), 9 ("3" in FY 2012), 16 ("4" in FY 2013). The performance reviews, however, consistently noted problems bearing on this dispute and on Gokhale's eventual termination. In 2013, for example, Gokhale was rated a 4 overall. ECF No. 99-1 at 7. Her manager concluded that Gokhale "is an extremely talented individual, who adds significant value to our IP Protection practice." *Id.* at 12. But in the sub-categories listed in the review, she was rated only a 3 in "impact and persuasion," "adaptability," "global collaboration," and "managing and motivating people." *Id.* at 9-10. Similarly, data gathered from co-workers for her 2015 performance review contained many positive comments, but also included the observations that "generally speaking the interactions with Sushama tend to be either confrontational or curt"; she "[c]ould have been more effective in communication to team members. . . . I am really unaware of the projects her team is working on, and how they can benefit IPP. Also I have sent many emails on many different issues, and I have not gotten many of these issues resolved"; "I find the communication between Ops and the business side a little lacking compared to the type of interactions I used to observe in past experiences"; and that "[h]er team[']s work has impacted me in that . . . many workarounds are needed to be performed, [which] caus[es] me much additional

time to correct simple matters." ECF No. 91-3 at 326-27.

In mid-2016, Conroy Shum decided to reorganize the Global Licensing Compliance team. ECF No. 91-4 at 3. His "original vision included reorganizing parts of the team under Ms. Gokhale's supervision and parts of the team supervised by another subordinate of [his], who was male." *Id.* at 3-4. Shum saw an opportunity to correct what he saw as data accuracy issues his team had been observing "by separating out some of the data management functions under Ms. Gokhale and putting them under a newly-created Director role focused on strategy related to ensuring data quality" – a new Director position that "would focus on big-picture, strategic thinking and . . . scalable, long term solutions to data quality issues." *Id.* at 4. This new data management strategy position was eventually titled IPP Data Strategy Director, and was at the Director level – the same level as Gokhale. *Id.* at 5. Shum envisioned that Gokhale would "continue to address 'one-off' data issues and clean[] up 'dirty data' as it was identified" – a role that he thought would play to Gokhale's strengths in systems management. *Id.* at 4.

To initiate the reorganization, Shum needed Human Resources approval, so he emailed that department in July 2016. *Id.*; *see also id.* at 12-13 (Shum email to HR). He contemplated that Dolby employee Brian Satterley would become the new Data Strategy Director. *Id.* at 5. Satterley "was an end-user of Ms. Gokhale's data who frequently struggled with its quality," and Shum "thought that he would be a good fit for the new data strategy role because he could bring an end-user perspective that was currently lacking" in data management. *Id.* Some of Shum's proposed changes required transferring away from Gokhale's supervision some of the employees who reported to her. *Id.* at 4-5. HR approved the reorganization. *Id.* at 5.

When Shum informed Gokhale of the reorganization in September 2016, her reaction was negative. *Id.* at 16. She wrote to Shum that she "support[ed him] fully," but "cannot support this action." *Id.* She disagreed with the proposed data management strategy and asked Shum to "pl[ease] think this over." *Id.* at 16-17.

As Dolby moved forward with the reorganization, Gokhale's opposition to it escalated. On October 1, 2016, she wrote to Fehervari, stating the reorganization "does not make sense," that "[t]he current proposed reassignments are not good for our business," that Shum "does not

3

1   understand the systems complexities well enough to correctly allocate the resources required to
2   keep [Dolby's licensing data] application running efficiently," that "Brian [Satterley] . . . has never
3   managed anyone before, [and] does not have broad-scale data management, deep excel analysis, or
4   systems skills," and that "Conroy indicated Brian has potential. This implies to me that (Brian's)
5   potential trumps (my) actual performance. I do not find this acceptable justification for making
6   this or any decision." ECF No. 91-2 at 378-79. On October 2, 2016, she sent an email to Vivian
7   Vassallo, Senior Director of Global Compliance, accusing Shum of "[n]ot doing his job" and
8   being a "[c]oward and [a] bully." *Id.* at 378.

9   On October 3, 2016, she wrote an email to Abby Evans, a business partner in Dolby's
10  Human Resources department, stating regarding the reorganization that she was "completely
11  baffled by this bizarre arrangement." ECF No. 91-3 at 107-08. On October 4, 2016, Evans
12  responded, stating among other things, "I can't speak fully to every aspect of Conroy' s vision, but
13  my understanding of this change was to enable you to engage on applications and systems without
14  being too entrenched in day to day data issues." *Id.* at 107. Gokhale responded back that same
15  day, describing the reassignment of one of her subordinates as a "terrible waste," and claiming,
16  "While Conroy is drum beating the next new thing I actually BUILT our mobile apps. My Van
17  Gogh is getting ripped here, and it needs to be supported." *Id.*

18  On October 13, 2016, she wrote Evans again. *Id.* at 111. She stated, among other things,
19  'I am generally a very positive person . . . but not on this one. . . . Stealing small silver before the
20  Ops house gets parachuted someplace else is fine, but not ripping out the roof and foundation of
21  the house. I need these people to meet my deliverables. . . . It is also ridiculous (and long term
22  untenable solution) that these folks should work for me and report into Brian or anybody else. . . .
23  I would not have done this. We are Dolby, not Enron. . . . I want my bosses to watch my back,
24  not stab me while I am down under the hood." *Id.*

25  In February 2017, Shum wrote an email summarizing a meeting with Gokhale. He wrote
26  that "the conversation did not go or end well. She made it clear that she doesn't agree with the
27  strategy, Brian's competence, and that she has a problem with me, and my decision. . . . At this
28  point, I'm exhausted to the point that I think I'm done trying to convince her to stay calm,

4

professional, and rational[] to see the bigger picture.  She is too passionately involved with her prior role, her 'van gogh' [sic] of a system, to see that we are doing something different to evolve the department, and expand our IPP efforts.  My recommendation is that we eliminate the Ops role, and give her a severance package."  *Id.* at 134-35.

Fehervari then wrote to Evans, expressing his concerns that "Sushama is refusing to accept the realignment, refusing to accept that Randy and Faith do not report to her, refusing to accept Brian (or the new hire Aaron) as capable, and ultimately refusing to accept Conroy's reasoned judgment here."  *Id.* at 134.  He stated that he did not "know all of the reasons for her refusal, but from my perspective, they are heavily influenced by her desire to maintain control of her turf and her belief that the system is her baby (or her 'Van Gogh' as she describes it).  But whatever the reason, it is now time to give her a final choice – accept the new role and aligned responsibilities, or choose not to work at Dolby."  *Id.*  "Because this has become such a major distraction, and a major impediment to a well-functioning department," Fehervari was "ready to take action now."  He asked that he and Evans discuss Gokhale at their next meeting.  *Id.*

Notwithstanding these concerns, Dolby managers decided to give Gokhale one more chance to embrace the team reorganization.  Shum wrote an email to the HR department, noting his "reservations and skepticism, as there are limits to my ability to convince [Gokhale] to support our plan forward.  Her clear objection[] to supporting the transformation, is demoralizing and is actively undermining the productivity of many members of the team, including myself."  But he "propose[d] to send a clear follow up message" "in an interest to try one more time to get her to work in a productive manner."  ECF No. 91-4 at 31-32.  On February 24, 2017, he sent her an email stating, "To the extent that this transition is still in process, again I need 100% of your support to ensure that by the end of the month, that we establish certainty. . . .  I expect you to take ownership to make things easier, so that we can get back to the work at hand."  *Id.* at 36.

On February 28, Gokhale called Shum's request "disingenuous" and announced she would contact the HR department to "go over our lack of agreement."  ECF No. 91-3 at 138-39.  Shum then again recommended immediate dismissal, telling HR, "I cannot allow her to think she is qualified to do my job, and make decisions for me."  *Id.* at 137-38.  Because she was "refusing to

5

separate the tasks and map the work," Shum said that Dolby should eliminate Gokhale's position or "issue a termination for cause." *Id.* Human Resources, however, suggested that Shum address this latest provocation "as a performance issue" and "role model what you want from her." *Id.* at 137. Following HR's guidance, Shum told Gokhale it was "unacceptable" to "refuse to perform the mapping exercise" he had instructed her to perform and that he needed her "full support to effectively transition [Dolby employees Ng and Dela Cruz] to their new reporting structure," identifying this as "a critical performance expectation." *Id.* at 144. Gokhale was to complete the mapping by the end of the day (March 1). *Id.*; *see also id.* at 18.

The same day, HR Business Partner Dan Young reinforced Shum's message, telling Gokhale that she needed to cooperate with the reorganization, and if she did not want to do so, he could explore a separation package. ECF No. 91-2 at 349-50. In her deposition, Gokhale admitted that she understood Young's warning to mean that she was being formally told that she had been "insubordinate. And if I continued to be insubordinate, I would be fired. . . . I had to make it work." *Id.* at 67-68; *see also id.* at 63-64.

Because Gokhale continued to resist the reorganization, Shum sent an email to Gokhale on March 15. ECF No. 91-3 at 157-58. Shum told her that he heard her concerns about the reorganization but had "made [his] decision to move forward with the changes" and was "no longer open to discussing or revisiting that decision"; instead, she was "to support the[] changes and implement them." *Id.* at 157. He warned Gokhale that "[f]ailure to comply with the changes, and additional refusal to support the organization, will result in disciplinary action." *Id.* at 158.

Later that day, Gokhale sent HR a 14-page document that included a proposed "org structure that will work for me and my team" – her own proposal to reorganize the department and reassign various senior managers while moving Satterley elsewhere. *Id.* at 160, 164-77. The following week, Gokhale scheduled a four-hour meeting with a Dolby employee, Ng, who was no longer her subordinate. *Id.* at 180. Shum told her she was wrong to take that action without consulting with that employee's supervisor, Satterley. *Id.* Gokhale responded that the employee was fully occupied in tasks for Gokhale and had no time for Satterley. *Id.* Shum forwarded this email to HR, stating, "Going in circles. I don't think I can be any more clear. She refuses to

accept the transition." *Id.* at 179.

On March 22, Shum directed Gokhale to work with Satterley on how her team and his (including Ng) would work on overlapping data issues. *Id.* at 183-84. Gokhale responded by accusing Shum of sending "deceptive emails" and by stating: "You need to understand what systems management and development means here. I am not sure it is clear to you." *Id.* at 183.

The following week, HR met with Gokhale and told her that she had to cooperate with management or she would lose her job. *Id.* at 21. They reminded her that the people she called "her resources" were Dolby employees whom management could reallocate and warned her to immediately cease her efforts to undermine the reorganization. *Id.*; *see also id.* at 186. Despite this directive, the next day Gokhale sent HR an email accusing Shum of telling "lies" and trying to steal her resources to add to his "zombie collection." *Id.* at 188.

On April 3, 2017, Dolby terminated Gokhale based on her continued refusal to cooperate with the reorganization and perform her job duties as directed. *Id.* at 22; see also ECF No. 103-2 (Evans Depo.) at 16 ("Q: Was she terminated for being insubordinate? A: That was – that was part of – that was a big part of the reason.").

Gokhale responds to this evidence as follows: First, she asserts that the asserted cause of her dismissal – her refusal to support the company reorganization – was pretextual and the reorganization itself was retaliatory. She asserts that the reorganization, begun in September 2016, was in retaliation for repeatedly reporting her concerns about Fehervari and a lack of opportunities for women employees to Evans "[b]etween late 2013 and 2017." ECF No. 1 ¶¶ 18-20; Gokhale Decl. ¶¶ 41-42. Specifically, she claims Fehervari and Shum took resources away from her group "in a course of action designed to impair [her] ability to do her job, and to sideline and eliminate her from the company," leading up to her firing in April 2017. Compl. ¶ 19. She further asserts that her systems management team was targeted for "increas[ed] harassment, bullying, and intimidation" after she complained about Fehervari's behavior. *Id.* ¶ 51. Although Dolby claimed to have fired Gokhale for "not cooperating with the reorganization of her group," Gokhale characterizes the 2016 reorganization as mere pretext for Dolby's true retaliatory and discriminatory motivations. *Id.* ¶¶ 19-20. The only evidence in support of these allegations

7

1    consists of Gokhale's comments to management and statements in her declaration filed in
2    opposition to summary judgment.

3          Gokhale also asserts that Fehervari, her direct supervisor during a portion of the period in
4    question, "targeted female employees with repeated harassment and intimidation." Compl. ¶ 13.
5    This misbehavior included being "loud, hostile, dismissive, and verbally and physically
6    intimidating" to female employees. *Id.* ¶ 16. For instance, Gokhale points to a July 2014 meeting
7    where, in the presence of Abby Evans, Fehervari got angry and yelled at Gokhale about her
8    performance. Gokhale Decl. ¶¶ 22, 24. Gokhale had complained to Evans about Fehervari's
9    "aggressive and abusive behavior" in May 2014, and complained again in July 2014, but asserts
10   that Evans did nothing to protect her or initiate an investigation. *Id.* ¶¶ 17-19, 26. After yelling at
11   Gokhale again in two meetings in November 2014, Fehervari reassigned her and directed her to
12   report to Shum. *Id.* ¶¶ 27-30. Gokhale asserts that on at least one occasion, "Fehervari leaned
13   towards [her] and raised his voice, causing [her] fear that he would use physical violence towards
14   her." Compl. ¶ 35. She also emphasizes an incident in March 2017 – one month before her firing
15   – when Fehervari exclaimed "fucking Sushama" to Senior Director of Global Compliance Vivian
16   Vassallo, *id.* ¶ 38, although Gokhale was not present when the comment was made.

17         On May 3, 2017, Gokhale received a right-to-sue letter from the California Department of
18   Fair Employment and Housing (DFEH). *Id.* at 19. On May 18, 2017, she received a right-to-sue
19   letter from the United States Equal Employment Opportunity Commission (EEOC). *Id.* ¶ 11.

20         On July 6, 2017, Gokhale brought suit asserting (1) gender discrimination in violation of
21   Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a), against Dolby;
22   (2) gender discrimination in violation of the California Fair Employment and Housing Act
23   ("FEHA"), California Government Code § 12940(a), against Dolby; (3) hostile work environment
24   on the basis of gender harassment in violation of Title VII, against Dolby; (4) hostile work
25   environment on the basis of gender harassment in violation of FEHA, California Government
26   Code §§ 12940(a) and (j), against all Defendants; (5) retaliation in violation of Title VII, 42
27   U.S.C. § 2000e-3(a), against Dolby; (6) retaliation in violation of FEHA, California Government
28   Code § 12940(h), against Dolby; (7) failure to prevent discrimination and harassment in violation

8

1  of FEHA, California Government Code § 12940(k), against Dolby; and (8) wrongful termination

2  against Dolby. *Id.* ¶¶ 21-67. Gokhale seeks damages, attorneys' fees, costs, and punitive

3  damages. *Id.* at 14-15.

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if there is enough evidence for a reasonable trier of fact to resolve the issue in the nonmovant's favor, and a fact is material only if it might affect the outcome of the case. *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)). The court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1018 (9th Cir. 2010).

Where the party moving for summary judgment would bear the burden of proof at trial, that party "has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party satisfies its initial burden of production, the nonmoving party must produce admissible evidence to show that a genuine issue of material fact exists. *Id.* at 1102-03. If the nonmoving party fails to make this showing, the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III. JURISDICTION

The Court has federal question jurisdiction over Gokhale's claims arising under Title VII pursuant to 28 U.S.C. § 1331. The Court exercises supplemental jurisdiction over Gokhale's state law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy.

## IV.  MOTIONS TO SEAL

A party seeking to seal a document filed with the court generally must (1) comply with Civil Local Rule 79-5; and (2) rebut the "strong presumption in favor of access" that applies to all documents other than grand jury transcripts and pre-indictment warrant materials. *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (citation and internal quotations omitted).

With respect to the first prong, Local Rule 79-5 requires, as a threshold, a request that (1) "establishes that the document, or portions thereof, are privileged, protectable as a trade secret or otherwise entitled to protection under the law"; and (2) is "narrowly tailored to seek sealing only of sealable material." Civil L.R. 79-5(b). An administrative motion to seal must also fulfill the requirements of Civil Local Rule 79-5(d). "Reference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable." Civil L.R. 79-5(d)(1)(A). As to the second prong, the Court must find "a compelling reason" supported by specific facts to justify sealing, because the briefing here is dispositive. *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016).

Gokhale moves to seal her opposition to the motion for summary judgment, ECF No. 92, and three of her four supporting declarations, ECF Nos. 92-1, 92-2, and 92-4. ECF No. 98. She does so solely because they contain information Dolby designated as confidential under the parties' stipulated protective order; Gokhale "does not agree that the challenged documents are privileged." ECF No. 98-1 at 2.

First, Gokhale moves to seal portions of her opposition to the motion for summary judgment, ECF No. 98-6, insofar as it refers to material Dolby has designated confidential. *Id.* Because Gokhale inadvertently filed an unredacted version of her opposition on the public docket, ECF No. 92, she also requests that document be removed from the public docket. *Id.* at 3. However, because Dolby does not in fact move to file Gokhale's opposition under seal, Gokhale's precautionary motion is denied as to these documents. *See* ECF No. 100.

Second, Gokhale moves to seal excerpts from the deposition transcript of Brian Satterley,

10

attached as Exhibit 2 to the declaration of Gabriel Hedrick at ECF No. 92-2. ECF No. 98-1 at 2. ECF No. 92-2 has already been removed from the public docket by Court order based on Gokhale's admission that it was filed in error and Dolby's representation that it contains confidential material. ECF No. 105. The material Dolby seeks to have redacted is testimony that references Dolby's financial goals, pricing, and audit strategy. ECF No. 100 at 5. Dolby's request is supported by Fehervari's declaration that other companies could leverage this information to Dolby's competitive detriment. ECF No. 100-10 at 2-3. The Court grants the motion to seal these excerpts. The sealing request is narrowly tailored and necessary to protect Dolby's confidential business information. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) (noting with approval that courts often seal "sources of business information that might harm a litigant's competitive standing"). Though Hedrick's original declaration has been removed from the docket, a redacted version remains available to the public at ECF No. 98-3.

Third, Gokhale preemptively moves to seal Exhibits 6-10, 15-18, 20, 22-23, and 26-32 attached to the declaration of Anton Handal at ECF No. 92-1. ECF No. 98-1 at 2. Dolby in turn moves only to redact Exhibits 15 and 30. ECF No. 100 at 2. Thus, Gokhale's motion is denied as to the remaining exhibits to Handal's declaration. As for Exhibit 15, Dolby moves to redact a description of a confidential complaint filed with Dolby's HR by an employee who is not a party to this lawsuit. Dolby argues that disclosure of this information would both infringe a third party's right to privacy and undermine the integrity of Dolby's internal grievance process. ECF No. 100 at 4. Similarly, Dolby moves to redact the personal cell phone number of another third-party employee which appears in the signature block of the email attached as Exhibit 30. *Id.* However, Dolby has failed to file any declaration supporting sealing these documents. Fehervari's declaration makes no reference to them. *See* ECF No. 100-10. Accordingly, the Court denies the motion to seal these exhibits.

Finally, Gokhale moves to seal Exhibits 1-2, 4-6, and 8 attached to her own declaration, originally filed at ECF No. 92-4, re-filed at ECF No. 96, and filed again at ECF No. 98-5 as an ostensibly redacted version in support of her motion to seal. ECF No. 98-1 at 2. Again, at Dolby's request, the Court has already removed Gokhale's declaration from the public docket as

11

erroneously filed or insufficiently redacted each of the three times it has been filed. ECF No. 105. Dolby moves only to redact paragraphs 50 and 51 of Gokhale's declaration, as well as Exhibit 1 to that declaration. ECF No. 100 at 2. Thus, the motion is denied as to the other exhibits included in Gokhale's preemptive motion to seal. As explained in Fehervari's declaration, Dolby's limited redactions to Gokhale's declaration and accompanying exhibit conceal confidential financial data and internal metrics. ECF No. 100-10 at 2-3. Because the Court concludes that the sealing request is narrowly tailored and necessary to protect information that, if revealed, could competitively disadvantage Dolby, the Court grants the motion to seal these excerpts. A properly redacted version of Gokhale's declaration remains available to the public at ECF No. 100-1.

In conclusion, the Court concludes that compelling reasons justify the sealing of the documents specified above. "[T]he document[s] filed under seal will remain under seal and the public will have access only to the redacted version, if any, accompanying the motion." Civil L.R. 79-5(f)(1).

## V.     DISCUSSION

Defendants move for summary judgment on all of Gokhale's claims. As outlined below, the Court will grant Defendants' motion in full.

### A.     Hostile Work Environment Gender-Based Harassment Claims

Gokhale claims she was subjected to a hostile work environment on the basis of her sex in violation of FEHA and Title VII. Compl. ¶¶ 33-47. She alleges that Fehervari "targeted [her] (and other women) with systemic and pervasive harassment, put downs, embarrassment, and displays of intense (and unwarranted) anger," including by being "loud, hostile, dismissive, and verbally and physically intimidating towards Plaintiff and her female counterparts." Compl. ¶ 16. She further asserts that Fehervari "would belittle female subordinates without provocation" and was "openly critical of [their] skills and abilities." *Id.* She asserts that a reasonable woman in her position could infer that "the denial of a promotion after good performance, the verbal abuse, [the] dismantling of resources needed to perform her job[,] and termination after a man without the requisite skills replaces her" were actions that were plausibly connected to her gender. ECF No. 92 at 36. Gokhale refers to Brian Satterley as her allegedly unqualified replacement. *See id.* at 25.

"To establish that she was subjected to a hostile work environment, [Gokhale] must prove that '1) she was subjected to verbal or physical conduct of a sexual nature, 2) this conduct was unwelcome, and 3) this conduct was sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment.'" *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002) (quoting *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995)). The term "sexual in nature" encompasses conduct that discriminates based on gender even if the conduct is not explicitly sexual. *See, e.g.*, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 19 (1993); *Griffin v. City of Portland*, No. 3:12-CV-01591-MO, 2013 WL 5785173, at *5 (D. Or. Oct. 25, 2013) (holding that "conduct need not be explicitly of a sexual nature to be actionable; conduct that occurs 'because of' the plaintiff's sex may give rise to liability even if it [is] not of an overtly sexual nature").

With the exception of Gokhale's allegations about Fehervari's shouting and profanity, all of the actions that Gokhale identifies concern the reorganization of Dolby's licensing group. For example, she points to Shum's action in July 2016 creating a new Director role for a different Dolby employee to take over data management functions that previously belonged to Gokhale. ECF No. 92 at 37. Gokhale has introduced no evidence to show or suggest that Shum's actions or those of any other Dolby manager were based on Gokhale's gender. "In proving a claim for a hostile work environment due to sexual harassment . . . the plaintiff must show that *but for the fact of her sex*, she would not have been the object of harassment." *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982) (emphasis added); *see also Brophy v. Day & Zimmerman Hawthorne Corp.*, 799 F. Supp. 2d 1185, 1195-96 (D. Nev. 2011) (granting summary judgment because plaintiff's "treatment was pursuant to a gender-neutral . . . policy"); *Guthrey v. State of California*, 63 Cal. App. 4th 1108, 1117 (1998) (rejecting claims of sexual harassment because supervisor "implemented routine office procedures and policies for her employees which were applied equally to men and women"). In other words, "[h]arassment that is neither sexual nor gender-based cannot constitute sexual harassment." Barbara T. Lindemann, Paul Grossman & C. Geoffrey Weirich, *Employment Discrimination Law* 20-22 (5th ed. 2012). For this reason, both Gokhale's state and federal sexual harassment claims fail.

1    Gokhale's state law sexual harassment claims against Shum also fail for a separate reason.

2    Under California law,

> commonly necessary personnel management actions such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or non-assignment of supervisory functions, deciding who will and who will not attend meetings, deciding who will be laid off, and the like, do not come within the meaning of harassment.  These are actions of a type necessary to carry out the duties of business and personnel management.

*Janken v. GM Hughes Elecs.*, 46 Cal. App. 4th 55, 64-65 (1996).  The reorganization of Dolby's licensing group falls squarely within the employer activities that California courts have held cannot constitute harassing conduct.

That leaves the behavior of Jeff Fehervari.  Almost all of Gokhale's allegations on that topic concern acts taken outside both the one-year period from the last date of sexual harassment to file a claim with the DFEH, Cal. Gov't Code § 12960(d), and the 300-day window for filing a claim with the EEOC after initially instituting an action before a state agency like the DFEH, 42 U.S.C. § 2000e-5(e)(1).  The sole potential exception is Fehervari's act of saying "fucking Sushama" in the presence of Senior Director of Global Compliance Vivian Vassallo.  Compl. ¶ 38.  Gokhale was not present when the comment was made.  ECF No. 91-2 at 60.  Fehervari made the comment when he realized that Gokhale had scheduled a meeting that he felt was unnecessary.  *Id.* at 283-84.  When Gokhale became aware of the comment, she complained to Dolby, which gave Fehervari "feedback and coaching and specific feedback that that is not behavior that is commensurate with a leader at Dolby."  *Id.* at 334.  This conduct is insufficient to maintain a sexual harassment claim against Fehervari or Dolby because although it was vulgar, Gokhale offers no evidence indicating that it was gender-related.  *See Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 295 (2006) ("While the FEHA prohibits harassing conduct that creates a work environment that is hostile or abusive on the basis of sex, it does not outlaw . . . vulgar language or conduct that merely offends.").

Accordingly, because Gokhale has shown no evidence that any of the unwelcome conduct she experienced was actually motivated by her gender, the Court concludes that Defendants are entitled to summary judgment with respect to Gokhale's hostile work environment claims.

14

### B. Sex Discrimination Claims

Gokhale alleges she was subject to sex-based discrimination in violation of Title VII and FEHA consisting of "the continued denial of promotion despite being qualified therefor, pervasive hostile treatment of herself and others, retaliatory actions designed to diminish her job resources, and finally terminating her employment." Compl. ¶¶ 23, 29; *see* 42 U.S.C. § 2000e-2(a); Cal. Gov't Code § 12940(a). She asserts that she was treated less favorably than similarly-situated male employees with respect to her compensation, terms, conditions, and privileges of employment because of her sex. *Id.* ¶¶ 22-23, 28-29.

The Court analyzes both Gokhale's Title VII and FEHA claims using the same standard. "California has adopted the three-stage burden-shifting test for discrimination claims [under Title VII] set forth in *McDonnell Douglas Corp. v. Green*[, 411 U.S. 792 (1973)]." *Sandell v. Taylor-Listug, Inc.*, 188 Cal. App. 4th 297, 307 (2010). "[T]he *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination." *Id.* (internal quotation marks omitted). To make out a prima facie case, a plaintiff must produce evidence showing that: (1) she belongs to a protected class; (2) she performed her job duties satisfactorily; (3) she was subjected to an adverse employment action; and (4) similarly situated individuals who were not members of the protected class were treated more favorably than she was. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).

After the plaintiff establishes a prima facie case, "a presumption of discrimination arises [and] the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to raise a genuine issue of fact and to justify a judgment for the employer, that its action was taken for a legitimate, nondiscriminatory reason." *Sandell*, 188 Cal. App. 4th at 307-08 (internal quotation marks and citations omitted). "If the employer sustains this burden, the presumption of discrimination disappears[, and t]he plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." *Id.* (internal quotation marks omitted).

The parties do not dispute that Gokhale is a member of a protected class or was subject to adverse employment actions. *See* ECF No. 91 at 38-39; ECF No. 92 at 8-9. Gokhale has

introduced sufficient evidence that she maintained a record of satisfactory performance. *See* ECF No. 92 at 10-12; ECF No. 96 ¶¶ 2, 5, 6, 9, 16. As for similarly situated males who were treated more favorably with regard to the adverse employment actions in question, Gokhale points to Fehervari, Shum, and Brian Satterley, who was promoted to a Director position co-equal to Gokhale and assigned two of her direct reports. ECF No. 92 at 25. Gokhale asserts that Fehervari was favored over her because she was "demoted and reassigned" while he was not punished for verbally abusing her. *Id.* at 21. She says Satterley was treated differently because he was promoted from Senior Manager to Director over a period of months, while she tried and failed for years to obtain a promotion from Director to Senior Director. *Id.* at 26. Finally, Gokhale says Shum was not yelled at or abused by Fehervari, and in addition, was afforded all the personnel resources he needed while she was having them taken away from her. *Id.*

       The Court first observes that none of these three men, positioned as they were above and below Gokhale on the corporate ladder, was obviously similarly situated to her. *See* ECF No. 91 at 38. But even assuming that Gokhale has made out a prima facie case of discrimination, she has not introduced sufficient evidence of pretext to undermine Dolby's showing of a good faith reason for her termination – namely, her persistent resistance to the ongoing reorganization of her department, which Dolby characterized as insubordination. *See id.* at 39. In her opposition to this motion, Gokhale responds that she could not have been insubordinate because she affirmed that she could do her job within the reorganization. *See* ECF No. 92 at 18. What she actually said was "I will continue to do my job," in the context of an email in which she also accused Conroy Shum of telling "lies" and trying to steal her resources to add to his "zombie collection." ECF No. 91-3 at 188. This email supports, and does not refute, Dolby's insubordination charge. More to the point, Gokhale has not introduced any evidence, direct or circumstantial, that Dolby's reorganization or her termination were motivated by discriminatory intent. Nor has she shown that Dolby's explanation is not believable for some other reason. "To show pretext using circumstantial evidence, a plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives." *Vasquez v. County of L.A.*, 349 F.3d 634, 642 (9th Cir. 2003), *as amended* (Jan. 2, 2004). Because Gokhale has not introduced such evidence here,

Defendants are entitled to summary judgment on Gokhale's discrimination claims.

### C. Retaliation Claims

Under FEHA, it is unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." Cal. Gov't Code § 12940(h). "To establish a prima facie case of retaliation, a plaintiff must show that she engaged in protected activity, that she was thereafter subjected to adverse employment action by her employer, and there was a causal link between the two." *Guthrey v. California*, 63 Cal. App. 4th 1108, 1125 (1998). A retaliation claim under Title VII encompasses the same three elements: protected activity, adverse action, and a causal link. *See Vasquez*, 349 F.3d at 646.

Under either statute, in order to permit a causal nexus between an employee's protected activity and the adverse employment action, as required to make a prima facie case of retaliation, the employer's action must follow within a relatively short time. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (temporal proximity must be "very close"); *Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102, 1110 n.6 (2007) (employer's action must follow "within a relatively short time"); *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 69 (2000) (causal link established by "proximity in time")

The facts here do not establish close temporality. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Breeden*, 532 U.S. at 273. Gokhale charges that the reorganization is retaliation by Fehervari and Shum for her claims in 2014. ECF No. 92 at 18. The reorganization began in September 2016. The events are simply too far apart in time.[2] *See,*

---

[2] A plaintiff may nonetheless be able to establish a causal connection "if between these events the employer engages in a pattern of conduct consistent with a retaliatory intent." *Wysinger v. Auto. Club of S. Cal.*, 157 Cal. App. 4th 413, 421 (2007). Gokhale does not offer such evidence here.

17

*e.g.*, *Breeden*, 532 U.S. at 274 (20-month period "suggests . . . no causality at all") (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (4-month period insufficient)).

Dolby is entitled to summary judgment on Gokhale's retaliation claims.

### D. Derivative Claims

Because the Court has granted summary judgment for Defendants on Gokhale's sex discrimination claims and retaliation claims, her derivative claims for wrongful termination and failure to prevent harassment and discrimination also fail, as do her claims for punitive damages.

## CONCLUSION

The Court grants summary judgment in full for Defendants. Defendants are ordered to serve a proposed form of judgment on Gokhale within five court days of the date of this order. Gokhale shall either sign the proposed judgment, indicating her agreement only as to form, or provide written objections to the form of judgment, within five court days thereafter. Within five court days thereafter, Defendants must file either an approved form of judgment, or a proposed form of judgment, a copy of Gokhale's objections, and a written response. The objections and response may be no longer than three pages each.

The trial date and all other deadlines and hearings in this action are vacated.

**IT IS SO ORDERED.**

Dated: March 6, 2019

_____
JON S. TIGAR
United States District Judge